327 P.2d 822

Kurt A. SCHNEIDER, Plaintiff and Appellant,

v.

Emil SUHRMANN, d/b/a Suhrmann's South Temple Meat Company, and Albert Noorda and Sam L. Guss, d/b/a Jordan Meat & Livestock Company, Defendants and Respondents.

No. 8716.

Supreme Court of Utah.

June 11, 1958

Rawlings, Wallace, Roberts & Black, Cannon & Duffin, Salt Lake City, for appellant.

Grant Macfarlane, F. Robert Bayle, Robert Gordon, Salt Lake City, for respondents.

CROCKETT, Justice.

Kurt A. Schneider sued for damages resulting from contracting trichinosis by eating mettwurst sausage[1] furnished by the defendants. Upon the basis of a jury's answers to special interrogatories, the trial court entered judgment against Emil Suhrmann the retailer, but refused to do so against the other defendants Noorda and Guss, the supplier.

Plaintiff's appeal assigned two main errors: (1) failure to award judgment against the supplier; (2) inadequacy of the damages given against Suhrmann, the retailer.

The contention that plaintiff is entitled to a judgment against the supplier rests upon the jury's answers to interrogatory No. 5, which consisted of two parts: (a) did supplier defendants know that Suhrmann intended to sell the mettwurst without processing it to kill trichina, to which the jury answered "no." (b) Would a reasonable prudent person in their position have known that Suhrmann would sell the sausage without so processing it, to which they answered "yes."

Plaintiff bases his claim of negligence against the supplier upon the doctrine, of which we do not doubt the correctness, that the supplier of a commodity, directly or through a third person, is subject to liability to those whom he should expect to use it if the supplier (a) knows of its dangerous potential, (b) knows or reasonably should know that the user will not realize the danger, and (c) the supplier fails to use reasonable care to safeguard against the danger or to inform the user of the facts which make it likely to be dangerous.[2]

To deal with the problems involved it is well to have in mind something of the nature of the disease and of the defendants' method of operation. Trichinosis is caused by a small animal organism known as trichina. Its usual source is uncooked pork, in which the quiescent larvae may exist.

---

1. A type of sausage of German origin which finds much favor with German people.

2. Restatement of Torts, Sec. 388.

When taken into the human digestive tract, the cyst enclosing the larvae dissolves, liberating the larvae, which then mature, mate and reproduce. The female lays eggs, or new encysted larvae, which find their way into the tissues of the larger muscles, particularly the arms, legs and diaphragm. The larvae cause a calcium deposit in the muscles and, if in sufficient number, may permanently affect them. During the initial and active stages of the disease it produces fever, headaches, chills and muscular weakness. The illness, and the resultant injury suffered varies greatly from very mild cases that are barely noticeable to severe ones which may last several weeks or months, and leave permanent muscular weakness. The danger may be guarded against by either freezing the pork for a long period, or by the simpler method of cooking, or heating it to at least 137 degrees Fahrenheit. This is usually done to all types of meat products containing pork, such as wurst and sausage, which are ordinarily eaten without being further cooked by the consumer.

The defendant Emil Suhrmann, who sold the mettwurst to the plaintiff, operates a delicatessen in which he specializes in prepared meats and sausages. He purchased this product from the defendant, Jordan Meat and Livestock Company operated by Albert Noorda and Sam L. Guss, who also operate the Valley Sausage Company which manufactures these prepared meats. As we view the issues, their exact business arrangement is not material here but they may be regarded and referred to as the supplier.

Suhrmann had been buying mettwurst from the supplier which had already been heated to the required 137 degrees Fahrenheit while it was being smoked in ovens for flavoring. In the Summer of 1955 the supplier informed Suhrmann that they could no longer furnish him with this mettwurst because the processor would not cool down the ovens to accommodate the processing of it, to which he replied:

"Let me have it, prepare it as far as you are able and then deliver it to me, and I will finish it. *I have an oven to smoke it, and I will take care of the rest.* What you don't—*what you cannot do I will complete* in my own business." (Emphasis added.)

In accordance with this direction the supplier processed the meat in the usual manner as completely as they could without the use of ovens, and delivered this unfinished product to Suhrmann. According to the evidence, he had indicated that heating spoiled the flavor his customers preferred in the mettwurst. In order to preserve the natural flavors, in the smoking process in his oven, he purposely kept the temperature below 80 degrees.

The jury found that plaintiff contracted trichinosis from eating mettwurst purchas-

ed from Suhrmann and no question is raised as to the sufficiency of the evidence to sustain that finding.

Notwithstanding the jury's answer to interrogatory No. 5(b) above referred to, to the effect that the supplier in due care should have known that the mettwurst would be sold without proper heating, the trial court refused to enter judgment against them on the ground that the evidence would not justify doing so.

The only fact of significance the plaintiff is able to point to inculpating the supplier is that they knew the unfinished mettwurst delivered to Suhrmann might contain trichina. It is true that Mr. Hoffman, who worked for the supplier, helped Suhrmann smoke the meat, working for the latter part time. But the jury, upon disputed evidence, expressly answered that Hoffman was not the agent of the supplier. Looking at it from the point of view of the supplier, it is difficult to see how they could reasonably be expected to disregard the directions of their customer. In the absence of knowledge of danger to the public, they had no duty to police or supervise Suhrmann in the operation of his business, and likely could not have continued to do business with him had they done so.

■ Suhrmann had the primary duty to safeguard the public from the danger involved. He accepted the responsibility and in a sense insulated the supplier from further duty in regard to the mettwurst by requesting that the meat be delivered to him uncooked and assuring them, "I have an oven to smoke it, and I will take care of the rest * * * What you cannot do I will complete. * * *" Excluding the knowledge of Hoffman, who, because of the jury's finding above referred to, must be regarded as the agent of Suhrmann and not of the supplier, the latter could have nothing more than suspicion that Suhrmann would sell the mettwurst to the public without correctly processing it. There must be something more substantial than mere suspicion or conjecture upon which to base liability.

■ The discussion above set forth is applicable, and is also deemed sufficient answer to, the other two bases upon which plaintiff seeks to predicate liability against the supplier. The first. of these rests upon the admittedly correct doctrine of implied warranty: that the supplier is deemed to warrant the product to be reasonably safe and suitable for the use for which it is intended. That rule, sound where applicable, may only be invoked where the supplier knows, or reasonably should know, that the retailer is to sell the product to consumers without further processing.[3] The second contention is that the selling of uncooked

3.  Catalanello v. Cudahy Packing Co., 264 App.Div. 723, 27 N.Y.S.2d 637.

pork containing trichina violates Secs. 4–20–5 and 8, U.C.A.1953, prohibiting the sale of impure and adulterated food products. Plaintiff avers that violation thereof results in absolute liability, even without proof of negligence. On those two points this further observation is pertinent: this product, although potentially dangerous in one stage of its processing, as are many food products, is quite harmless if the preparation for consumption is completed. Under the circumstances here described, the supplier was entitled to assume that reasonable care and prudence would be exercised in regard to the product and was not obliged to anticipate that it would be handled by the retailer in a manner which was dangerous or in careless disregard of the safety of others.

Plaintiff's attack upon the damages is grounded upon the contention that the suffering he endured, coupled with the loss of time and income, were such that the award of $2,000 is so obviously inadequate that the verdict should be set aside and a new trial granted; or in the alternative, an increase to a fair and reasonable compensation for him should be ordered, which the defendant should be required to accept or submit to a new trial.

It is not to be questioned that the plaintiff endured considerable illness and distress. When he first developed the fever and other symptoms he had to be hospitalized for four days; was confined to bed for about a month and could not return to his usual work for another month. Although he continued to improve, he complained of the usual after effects of the disease; weakness and sometimes dizziness; and it was necessary to check with his doctor at intervals. The latter testified that in January, 1957, just prior to the trial, and about 16 months after he had the disease, he found no residual abnormal conditions existing.

In regard to the plaintiff's income: he was engaged in selling, having the franchise to sell certain imported articles, Dresden figurines and Black Forest cuckoo clocks; and also sold insurance. He purports to demonstrate a loss of as much as $4,400 in earnings and potential. We are not concerned with the maximum the jury could have found under the evidence, but in order to overturn the verdict, plaintiff has the burden of showing that the jury must have found damages in excess of those awarded. Without discussing the details as to his income, it can be stated generally that as we view the evidence, there was no showing that, except for about 60 days he was actually away from work, would compel a finding either that his income actually diminished, or that any diminution of income proximately resulted from this illness.

■ Cases dealing with the review of damages found by a jury, with invariable consistency, recite the reluctance of courts

to interfere with such verdicts if there is any reasonable basis in the evidence upon which they can be sustained.[4] This is based partly upon the often referred to advantages the fact trier has in being in immediate contact with the trial, the parties and the witnesses.[5] In addition thereto, the question of damages for personal injuries involving the intangibles of pain and suffering, with respect to which reasonable minds are apt to differ greatly, are matters which a jury is peculiarly adapted to determine. One of the principal merits of the jury system is that it brings together people from different walks of life, with distinctive points of view arising out of their varied experiences. Bringing these different points of view to bear upon the appraisal of such values is a method to which the parties have a right. It is in order to preserve this right of trial by jury, and to afford litigants the advantages referred to above, that it has been the policy of courts to exercise forebearance in disturbing jury verdicts and to allow their deliberations to swing like a pendulum through a wide arc without interference so long as they remain within the bounds of reason. The refusal of the trial court to modify the verdict endows it with some further degree of sanctity which increases our hesitancy in disturbing it upon review.[6] As we survey the evidence, in the light of the principles above set forth, the verdict of the jury in the instant case was well within the latitude allowed in determining the question of damages.

■ The defendant Suhrmann also cross-appealed assigning as error:

(1) the refusal of the trial court to consider his claim for damages suffered because: (a) he contracted trichinosis by eating the mettwurst himself; and (b) his business suffered because of the illness contracted by his customers and the notoriety attendant thereupon;

(2) the refusal to consider the issue of implied warranty of the fitness of the product for the purpose for which it was made.

The discussion above sufficiently answers Suhrmann's points on cross-appeal. He knew the nature of the product he was selling; that it might contain trichina; and that there were means to kill it; and he knew that this had not been done. In fact, as above set forth, he had asked the supplier to deliver it to him without such heating because that would spoil the flavor. His own knowledge and actions would make him guilty of contributory negligence

4. Paul v. Kirkendall, 1 Utah 2d 1, 261 P. 2d 670.
5. See statement in Nokes v. Continental Min. Mill. etc., 6 Utah 2d 177, 308 P.2d 954, 955.
6. Stamp v. Union Pac. R. Co., 5 Utah 2d 397, 303 P.2d 279, 283; citing Pauly v. McCarthy, 109 Utah 431, 184 P.2d 123; Geary v. Cain, 69 Utah 340, 255 P. 418; 5 C.J.S. Appeal and Error § 1651, p. 380.

and preclude his recovery as a matter of law and the trial court correctly so ruled.

Affirmed. Costs to respondents (defendants).

McDONOUGH, C. J., and WADE, WORTHEN and HENRIOD, JJ., concur.